**Andre WAUL, Plaintiff,**

**v.**

**Thomas A. COUGHLIN, III; Earl B. Moore, Edwin Muller; Superintendent Artuz; Ernest Davis, Jr.; Thomas J. Levanduski; and William F. Hutchinson, Defendants.**

No. 93 Civ. 753(DLC).

United States District Court,
S.D. New York.

Dec. 16, 1997.

Christopher J. Harnett, Hallie Kostrinsky, Patricia Martone, Fish & Neave, New York City, for plaintiff.

Dennis Vacco, Attorney General of the State of New York by Michael O. Huston, Assistant Attorney General, New York, for defendants.

## OPINION

COTE, District Judge.

On April 17, 1997, a jury returned a verdict against plaintiff Andre Waul ("Waul") and found defendants Ernest Davis, Jr. ("Davis") and Edwin Muller ("Muller")[1] not liable on the claim of unlawful retaliation in violation of Section 1983 of Title 42, United States Code, and the First Amendment of the United States Constitution. In brief, the claim of retaliation arose as follows. Waul, while an inmate at Green Haven Correctional Facility ("Green Haven"), had filed grievances against Davis, who as Green Haven's Protestant Chaplain had supervised Waul's work in Green Haven's Protestant Center. After those grievances had been filed, Davis requested that Waul be transferred out of Green Haven, which led to Waul's transfer to Clinton Correctional Facility in September 1991. Davis was aware that Waul had lodged grievances against him, but explained to the jury that those grievances had not been the reason that he had requested Waul's transfer. He contended that Waul's behavior in the Protestant Center, which he described as including threats, abusive language, and efforts to turn other inmates against him, was the reason he requested Waul's transfer. Muller, who as Director of Ministerial and Family Services for the New York State Department of Correctional Services ("DOCS") and as Davis' supervisor, was aware of Davis' request that Waul be transferred out of Green Haven and of Waul's

---

1. The Court dismissed plaintiff's claims against defendant Earl Moore at the close of all of the evidence. Prior to trial, the Court had granted summary judgment in favor of all of the other defendants.

allegation that the request was retaliatory. Muller testified, however, that he had no authority to prevent the transfer.

In order to support his claim that the transfer was retaliatory, Waul sought to prove that approximately one year later, in June 1992, Davis also requested the transfer of three other inmates who had complained to DOCS about him. On the stand, however, Davis denied that he had discussed or been involved with the transfer of these other inmates. Following trial, and at the direction of the Court, the State produced documents that show that Davis had, contrary to his trial testimony, requested the transfer of the three inmates. Although Waul had requested these documents during discovery prior to trial, the defendants had not produced them. Waul now moves for a new trial, principally on the ground that the documents produced after trial show that Davis committed perjury at trial. For the reasons stated below the motion is denied.

## Background

As noted, Waul's claim centers on grievances he filed against Davis. On May 7, 1991, Waul filed an inmate grievance against Davis alleging that Davis had been wrongfully withholding his pay for his work at the Protestant Center since January 29, 1991. On May 20, 1991, Waul filed another grievance again asking for his back pay, and requesting that Davis be stopped from filing inaccurate "Incentive and Allowance Evaluation and Progress Reports", and that previously filed inaccurate progress reports be corrected. As a result of these grievances, Waul's inmate account was credited with $1.08 of back pay and Davis instituted a sign-in log to record attendance.[2] On June 21, 1991, Waul filed a third grievance, which requested that he be paid his back pay, that he receive his pay in the future, that Davis follow DOCS' rules and that Waul be allowed to keep the same job assignment in the Protestant Center. This grievance was denied because, according to inmate payroll records, Waul had received his back pay on May 28,

1991, and complaints about job assignments are not subject to the grievance process. On June 26, 1991, Davis requested that Waul be removed from his job at the Protestant Center as soon as possible. On July 22, 1991, Davis requested that Waul be transferred out of Green Haven as soon as possible. Waul was transferred from Green Haven on September 16, 1991.

Waul contends that Davis also retaliated against three other inmates—George Astacio ("Astacio"), Raul Martinez and Cleophes Castillo (collectively "the three inmates")— who also worked under Davis in the Protestant Center and who were transferred out of Green Haven approximately one year after Waul's transfer. Astacio explained in his affidavit submitted in opposition to the defendants' motion for summary judgment in this action that he believed that Davis transferred Waul in retaliation for Waul's grievances against Davis. In support of this conclusion, Astacio contradicted in detail Davis' description of Waul's behavior in the Protestant Center and testified as to his belief that Davis had caused the transfer of the three inmates from Green Haven in retaliation for their letter of complaint about Davis to a DOCS official. Astacio explained that he had been an inmate at Green Haven since 1984 and was working with inmates Cleophes Castillo and Raul Martinez at the Protestant Center in June 1992. On June 2, 1992, Davis fired the three inmates from their jobs in the Protestant Center. Seven days later, on June 9, 1992, the three inmates wrote to Petrita Hernandez Rojas, Director, DOCS Hispanic & Cultural Affairs ("Rojas"), to complain about their dismissal. On June 20, 1992, after he had sent his letter to Rojas, Astacio was transferred to Wendy Correctional Facility, which is in the western part of New York State. The other two inmates were transferred out of Green Haven around the same time. At trial, Astacio testified that he never learned of the reason for his sudden transfer, but believed that Davis had requested it.[3] According to Astacio, none of

---

2. Plaintiff, in this motion, indicates that like the documents discussed above, this sign-in log was requested by the plaintiff in discovery but not produced.

3. After the trial and at the plaintiff's request, Astacio executed a release for his prison records, which led to the production of the documents at issue here.

the three inmates had any misbehavior reports lodged against him during that period of time; indeed, just six months earlier he had been transferred to the "Honor Block."

At trial, plaintiff's counsel examined Davis about the transfers of the three inmates from Green Haven as follows:

Q: Did you participate in any way in the transfer of Mr. Astacio from Green Haven?

A: Participation was that Mr. Astacio was fired from the [P]rotestant Church and returned back to the program committee, sir.

Q: Did you have any discussions with anyone about Mr. Astacio's transfer from Green Haven?

A: No, sir.

Q: Do you also deny that you had any discussions with anyone with respect to Mr. Martinez's transfer?

A: No discussions, sir.

Q: Did you have any discussions or involvement with the transfer of Mr. Castillo from Green Haven?

A: No, sir.

After trial, the State produced two June 1, 1992 memoranda from Davis requesting the transfer of Astacio and Castillo. Davis complained that Astacio had conducted a love affair with one of the volunteers in the Protestant Center and complained of Astacio's attitude toward "Supervision" in the Center; he asserted that Castillo had become aggressive toward the staff at the Protestant Center. The transfer requests were approved on June 9 and 10, 1992, respectively. A transfer record for Martinez reflects a decision on June 12, 1992 to transfer him due to a request from, apparently, his supervisor in the Ministerial Services Program. The evidence at trial would support an inference that that supervisor was Davis. These documents, therefore, indicate that Davis did request the transfer of the three inmates, but that his requests were made before the three inmates complained about him to Rojas.

**Standard**

The standard for granting a new trial, pursuant to Rule 59, Fed.R .Civ.P., is well-settled.[4] This Court may grant a new trial if it is convinced that the jury's verdict was "against the weight of the evidence" or that the jury has reached a " 'seriously erroneous result.' " *U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.,* 38 F.3d 1289, 1301 (2d Cir.1994) (quoting *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983)). *See also Piesco v. Koch,* 12 F.3d 332, 344 (2d Cir.1993). The Second Circuit has also characterized this standard as one of determining whether "the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prod., Inc.,* 861 F.2d 363, 370 (2d Cir.1988). Under this standard, the Court "is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992) (internal citation omitted). Even if there is substantial evidence to support the jury verdict, a new trial may be warranted. *Id.* Nevertheless, the Court must bear in mind that

> [w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.

*Piesco,* 12 F.3d at 345.

Motions for a new trial based on newly discovered evidence are disfavored. *See Zink Communications v. Elliott,* 90 Civ. 4297, 1990 WL 170469 at *1 (S.D.N.Y. Oct. 26, 1990). According to the Second Circuit, newly discovered evidence is "evidence of facts in existence at the time of trial, of which the aggrieved party was excusably ignorant." *Campbell v. American Foreign S.S. Corp.,* 116 F.2d 926, 928 (2d Cir.1941). When a party seeks a new trial based on the discovery of new evidence,

> there must be a showing that the alleged newly discovered evidence was discovered since the trial; facts from which the court

4. This motion is timely under Rule 59, Fed.R.Civ. P., having been made before judgment was entered.

may infer reasonable diligence on the part of the moving party; that the evidence is not merely cumulative or impeaching; that the evidence is material; and the evidence is of such a character that on a new trial it will probably produce a different result.

*Zink Communications,* 1990 WL 170469 at *1. *See also Ope Shipping, Ltd. v. Underwriters at Lloyds* 100 F.R.D. 428, 432 (S.D.N.Y.1983) (collecting cases). The Court may grant a new trial to "prevent a grave miscarriage of justice" even where the newly discovered evidence could have been discovered prior to trial with due diligence, but for this exception the evidence must be "practically conclusive". *Zink Communications,* 1990 WL 170469 at *1 (quotation omitted).

## Discussion

Waul moves for a new trial on the grounds (1) that there is newly discovered evidence that Davis committed perjury at trial when he denied requesting the transfer of three inmates one year after he requested Waul's transfer, and (2) that the testimony of an official who made the decision to transfer Waul was improperly admitted at trial.

### Davis' Perjury

 As to the first prong of the new trial motion—that the documents Waul obtained after trial show that Davis committed perjury during the trial—the defendants first contend that Waul did not exercise due diligence prior to trial to obtain the documents. A brief description of discovery is necessary to evaluate this contention.[5]

Waul's First Set of Interrogatories and Document Requests, dated August 14, 1995 ("First Requests") contained twenty-two Interrogatories and eleven Document Requests, including a request that the State identify all inmates who were assigned to work in the Protestant Center at Green Haven and who were transferred from Green Haven to another correctional facility between August 1991 and August 1992, the reasons for the transfers, the identity of the DOCS' employees who requested the transfers, and the documents reflecting this information ("the Transfer Requests"). In their Response, defendants answered certain Interrogatories and produced some documents, but objected to the Transfer Requests on the grounds that the information sought was irrelevant, not reasonably calculated to lead to admissible evidence, and burdensome to produce. At no time thereafter did the plaintiff[6] or his counsel[7] ask this Court to compel production of the documents identified in the Transfer Requests. Even though Waul did not have the documents relating to the transfer of other inmates, he contended in his April 26, 1996 opposition to the defendants' motion for summary judgment that Davis had requested the transfer of other inmates as well as his own.[8] He argued that Davis had done so in each instance for impermissible retaliatory reasons. Despite the critical role that these incidents played in the plaintiff's strategy of proving Davis' wrongful in-

5. This action has a history of the Attorney General's Office being unresponsive to the plaintiff. On July 26, 1993, Waul amended his complaint at the direction of the Chambers of the Honorable John E. Sprizzo, to whom the case was then assigned. After being served with the amended complaint, the defendants should have moved or served an answer no later than October 3, 1993. The defendants did not file an answer until January 6, 1995, after this Court had sent a letter to the parties directing the plaintiff to obtain assistance from the Court's Pro Se Office in filing a motion for a default judgment and after the plaintiff had filed such a motion. On April 26, 1995, this Court denied Waul's motion for a default judgment, but sanctioned the Attorney General's Office for failing to answer the complaint in a timely fashion.

6. Waul has written the Court on several occasions to obtain assistance with his prosecution of his case. For instance, Waul wrote to the Court twice—on September 28, 1995 and November 20, 1995—to request assistance in getting a response to the First Requests from the defendants.

7. On January 18, 1996, the firm of Fish and Neave—although not the same individual attorneys who represented plaintiff at trial—entered an appearance for the purpose of assisting plaintiff with his opposition to defendants' summary judgment motion. After the Court issued its Opinion on that motion, the firm at first declined and then agreed to represent plaintiff at trial.

8. These contentions are contained in the affidavit of Astacio, described above, and submitted with plaintiff's opposition to the summary judgment motion.

tent, the plaintiff did not attempt to obtain further information regarding the three inmates until after trial. In addition, there is no evidence—nor does the plaintiff contend—that the defendants' trial counsel, who were not the same individuals who prepared the discovery response, knew that the documents existed or of Davis' intent to give misleading trial testimony regarding his involvement in the transfer of the three inmates.

The discovery of new evidence does not warrant a new trial when that evidence could have been discovered through the exercise of diligence prior to trial. *See Zink Communications*, 1990 WL 170469 at *1. While in certain circumstances a *pro se* litigant may be relieved of the obligations that ordinarily apply to litigants prior to trial, *see, e.g., Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir.1997), the circumstances here do not indicate that Waul should be relieved of the obligation to seek the Court's assistance, if such assistance is necessary, to obtain the information which he considers of importance to his lawsuit. Waul is an intelligent, articulate plaintiff who knew of his right to discovery and who requested and received the Court's assistance in obtaining discovery on several occasions. Moreover, at critical times in the litigation, both prior to trial and during trial, Waul was represented by counsel. Waul's counsel made no request to compel compliance with outstanding discovery requests or to reopen discovery until after the completion of the trial. In these circumstances, the plaintiff's failure to exercise due diligence is alone sufficient to deny his motion for a new trial.

 Turning to the other factors to be considered in deciding whether to grant a new trial based on the newly discovered evidence, the Court is similarly unconvinced of the need for a new trial. The Court addresses the issue of materiality first. Waul contends that the evidence that Davis requested the transfer of the three inmates and the documents through which those requests were made would be properly received at trial as similar act evidence under Rule 404(b), Fed.R.Evid.

The documents produced after trial demonstrate that Davis' trial testimony concerning the transfers of the three inmates was at a minimum misleading regarding all three inmates, was clearly inaccurate as to Castillo, and was arguably untruthful regarding all three. The transfer requests, however, predate the letter of complaint about Davis sent by the three inmates to Rojas. Therefore, while the transfer requests, taken in the light most favorable to the plaintiff, demonstrate both Davis' inability to get along with inmates under his supervision and that he may have lied on the stand in denying that he had discussed or been involved with the transfers, they were made *before* the three inmates had made any written complaint about Davis, and as a result have limited probative value for Waul's retaliation claim.

Waul argues that the transfer requests are retaliatory even though they were made before the three inmates complained to Rojas because the transfers were requested to retaliate against the three inmates for their advocacy on behalf of Hispanic faith groups. The three inmates had advocated greater participation in the Protestant Center worship services by Hispanic faith groups. Waul argues that such advocacy on the part of the inmates constitutes "grievances" as that term is defined by DOCS. For purposes of this motion, I accept that the plaintiff would have been able to prove at trial that the three inmates advocated greater participation by Hispanic faith groups in the activities of the Protestant Center, and that that advocacy constituted a complaint or grievance about a DOCS' procedure. Any probative value of the evidence concerning the transfer of the three inmates, however, is substantially weakened by the fact that there is no evidence that any of the three inmates had complained about Davis to anyone else in DOCS prior to the time that he requested their transfer. The jury's likely inference from this evidence would be that Davis had difficulty getting along with strong-willed inmates, not that—as plaintiff would have them conclude—that Davis retaliated against them for exercising a constitutionally protected right, proof of the latter being a requirement for any claim of retaliation. *See, e.g., Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Moreover, admission of this similar

act evidence would have substantially complicated the issues at trial, requiring three mini-trials so that the jury could properly assess Davis' reasons for requesting the transfers of the three inmates. Given the limited probative value and the danger of confusion and waste of time, pursuant to Rules 404(b) and 403, Fed.R .Evid., the Court finds that the evidence regarding the transfers of the three inmates is not admissible as evidence of similar acts.

■ Waul argues that even if the evidence of these other transfers is not admissible under Rule 404(b), Fed.R.Evid., it would have been admissible to impeach Davis' testimony. Specific instances of the conduct of the witness for the purpose of attacking the witness' credibility, however, may not be proved by extrinsic evidence. *See* Fed. R.Evid. 608(b); *Ricketts v. City of Hartford,* 74 F.3d 1397, 1413 (2d Cir.1996). In any event, the Court should not grant a new trial on the basis of newly discovered evidence "the effect of which is merely to discredit, contradict or impeach a witness." *Nat'l Labor Relations Board v. Sunrise Lumber & Trim Corp.,* 241 F.2d 620, 626 (2d Cir.1957). Moreover, the impeachment here would have concerned a collateral issue—whether Davis lied about his role in the transfer of inmates other than the plaintiff. *See, e.g., Rosario v. Kuhlman,* 839 F.2d 918, 926 (2d Cir.1988) ("a fact is not a collateral matter if it could be shown in evidence for any purpose independent of the contradiction") (citation omitted).

■ The final factor for the Court to evaluate is whether upon retrial the newly discovered evidence would produce a different result. Even assuming the evidence would be admissible at a new trial, it is unlikely to lead to a different result. There was ample testimony at trial from which the jury could assess the credibility of the witnesses as they described their very different versions of the events at the Protestant Center leading up to Waul's transfer. As discussed above, the fact that Davis was involved in the transfer of the three inmates one year after Waul's transfer and under circumstances that were not substantially similar to those surrounding Waul's transfer, makes it unlikely that the jury, if presented with this evidence, would change its verdict and find that Davis impermissibly retaliated against Waul for his filing of grievances. For all these reasons, the Court denies the motion to grant a new trial based on newly discovered evidence.

*Levanduski's Testimony*

■ Waul's motion for a new trial contains a second argument which is unrelated to the transfer of the three inmates. Waul argues that the testimony of DOCS' Senior Counsel Thomas J. Levanduski ("Levanduski") was improperly admitted at trial and significantly prejudiced Waul's case. Arguing that this Court's cautionary instruction to the jury was insufficient to eliminate the prejudice, he urges that the Court grant him a new trial.

Levanduski was called by the defendants to explain the process by which a decision to transfer an inmate is made. It was Levanduski's responsibility to evaluate Davis' request to transfer Waul and to recommend an action to be taken based on that request. At the beginning of the trial, the defendants sought to offer Waul's prison disciplinary record, including two transfers to separate Waul from prison staff, to show that Waul had a history of refusing orders from those prison staff with whom he disagreed, of turning inmates against staff, and of creating dangerous a situation by doing so. The Court ruled that the defendants could not use Waul's disciplinary record at all for this purpose, and to the extent the defendants wished to use it to explain Levanduski's decision-making process, the Court ruled that Levanduski could testify only in general terms as to his decision-making process, including a general description of Waul's disciplinary record, unless the plaintiff opened the door through his own testimony about his prison record or by specific questioning of Levanduski. As a consequence, during his direct testimony Levanduski described the DOCS' transfer process generally and, without describing specific incidents reflected in Waul's prison record, how he arrived at his recommendation regarding Waul's transfer.

During cross-examination, plaintiff's counsel asked Levanduski whether he had considered several counselors positive evaluations of Waul's record in late 1990 when making

his recommendation to transfer Waul.[9] The Court found that this questioning about information favorable to Waul opened the door to the defendants' re-direct examination of Levanduski about negative disciplinary reports. Among other items regarding Waul's past disciplinary record, Levanduski testified that Waul had been transferred on several prior occasions due to difficulties Waul had with program counselors. Levanduski testified:

Q. The Attica transfer, you said that was separation of staff transfer?

A. Yes. There was a problem with the Consortium College program that he was attending. He apparently had verbal disagreements which started to border on physical with the college professors. And then the other inmates were taking the courses became very irate that the classes were being disrupted, and he apparently received threats we just had to get him out of the facility.

Q. You mentioned the Auburn transfer also.

A. He, again, was having trouble with supervisors in his work programs and he was having trouble following orders. Kind of a persistent problem.

The draft charge that the Court provided to the parties prior to the charging conference addressed Levanduski's testimony as follows:

[t]here has been some reference during the trial to alleged activities by plaintiff Waul while he was an inmate but before he arrived at Green Haven and actions taken by the Department of Correctional Services in response to those activities. You have had no testimony about those events from any witness who was a participant in

those events. You were permitted to hear this testimony solely for the light it sheds, if any, on Levandusky's [sic] decision-making process regarding Waul's September 16, 1991 transfer. You may not consider this evidence for any other purpose. Specifically, you may not use this evidence to conclude that because Waul may have acted a certain way in the past, he must also have acted in a certain way while at Green Haven in 1990 or 1991.

At the charging conference, the plaintiff proposed the following additional language:

But bear in mind, Levanduski's decision-making process has nothing—is not relevant in any way to the issue of whether or not Rev. Davis' request to transfer Mr. Waul was undertaken for a retaliatory motive, or for whether there was a legitimate separate reason for Mr. Waul's transfer to Clinton.

The Court adopted the plaintiff's request, in substance, and added the following instruction at the end of the excerpt from the draft charge quoted above:

Moreover, Levandusky's [sic] decision-making process is not relevant to the issue of whether defendant Davis made the request that Waul be transferred with a proper or with a retaliatory motive. Finally, while it is for you to decide each of the fact issues in this case, it is not disputed that defendant Davis' transfer request had a role in Waul's transfer out of Green Haven.

The plaintiff did not object to this language.

Plaintiff now argues that this instruction was not sufficient to purge the prejudice of Levanduski's testimony. There is no reason to believe that the jury did not follow the

---

9. For example, plaintiff's counsel asked the following questions about evaluations:

Q. Isn't it a fact that in late 1990, both counselors McGaughey and Haywood wrote positive evaluations of Mr. Waul's performance at Green Haven? . . .

Q. When I asked you before if counselors Haywood or McGaughey wrote an evaluation of his performance that would indicate good behavior, you said something about, well, in Sing Sing. These took place in Green Haven right? . . .

Q. Okay. Exhibit 5 shows that there is an acceptable behavior record for the relevant period? . . .

Q. Did you consider these acceptable behavior reports when you considered Rev. Davis' transfer request? . . .

Q. Is it fair to say that when you considered Rev. Davis' July request to transfer Mr. Waul, you considered information provided by Mr. Davis, Rev. Davis, but you did not consider the information on the disciplinary reports that were signed by counselors McGaughey and Haywood?

cautionary instruction in weighing Levanduski's testimony. Since the plaintiff opened the door to the adverse testimony he now challenges by eliciting testimony regarding positive behavior reports, providing the jury a more complete picture of Waul's transfer record did not result in a miscarriage of justice warranting a new trial.

### Conclusion

The Court denies plaintiff's motion for a new trial. The Clerk of Court shall enter judgment for the defendants and close this action.

SO ORDERED.